IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **HUAWEI TECHNOLOGIES CO., LTD.**, a Chinese corporation, and **FUTUREWEI TECHNOLOGIES, INC.**, a Texas corporation,<br><br>          Plaintiffs,<br>     v.<br><br>**YIREN RONNIE HUANG**, an individual, and **CNEX LABS, INC.**, a Delaware corporation,<br><br>          Defendants. | NO. 4:17-CV-893-ALM<br><br>Jury Trial Demanded |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
<u>REQUEST FOR HEARING</u>**

Plaintiffs Huawei Technologies Co., Ltd. ("Huawei") and Futurewei Technologies, Inc. ("Futurewei") (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully move this Court to preliminarily enjoin Defendants Yiren Ronnie Huang ("Huang") and CNEX Labs, Inc. ("CNEX") (collectively, "Defendants")

- from directly or indirectly declaring any of the patents or patent applications listed in Plaintiffs' Complaint in this matter as essential to any of the Non-Volatile Memory ("NVM") Express standards; and

- from entering into any licensing agreements or in any way conveying or disposing any rights to or in any of the patents or patent applications listed in Plaintiffs' Complaint in this matter.

1

## I. INTRODUCTION AND BACKGROUND

Defendant Huang is a former employee of Futurewei, which hired him in January 2011 to research various technologies, including architecture design and product development about Solid State Storage Devices ("SSD") technology and Advanced Computing Network ("ACN") technology. SSD technology is a method of storing information on non-volatile memory and allows for data to be accessed more quickly than data stored on magnetic media. As part of his job responsibilities, Huang worked closely with employees of Plaintiffs on researching and developing SSD architecture, ACN architecture and chip design, and related products. This research included extensive work on the implementation of Non-Volatile Memory Express ("NVMe") interface. NVMe is a logical interface for accessing SSD non-volatile storage media.

At the outset of his employment with Futurewei, and as a condition of that employment, Huang entered into an Employment, Confidentiality, Proprietary Information and Inventions Agreement with the company ("the Agreement"). (A true and correct copy of this Agreement is attached hereto as Exhibit A.) Huang's job responsibilities involved access to Plaintiffs' confidential, proprietary and trade secret information, including highly sensitive information about Plaintiffs' research, development, products, and market analysis. Accordingly, pursuant to the Agreement, Huang agreed to not disclose any of Futurewei's confidential, proprietary and trade secret information to anyone not authorized to receive that information. (Ex. A at pp. 1-2, ¶1.) Moreover, Huang agreed to assign to Futurewei, *inter alia*, any invention or idea that he conceived of that related to his work at Futurewei. (*Id.* at pp. 2-3, ¶ 3(a)-(b).) The Agreement also required Huang, for one year following termination of his employment, to provide Futurewei with a complete copy of each patent application filed by Huang or that named Huang as an inventor or co-inventor. (*Id.* at pp. 3, ¶ 3(d).)

Huang resigned from Futurewei effective May 31, 2013. Three days later, he established Defendant CNEX with two other individuals. Less than a month later, Huang began filing patent applications that were based on or related to work that he performed while employed by Huawei, and specifically related to his work on NVMe technologies. Rather than being timely informed of those patent applications by Huang per the requirements of the Agreement, Plaintiffs only discovered Huang's conduct in 2016, after the United States Patent and Trademark Office ("USPTO") published one of Huang's patent applications that was closely related to his work at Futurewei. Since Huang's departure from Futurewei and founding of CNEX, approximately 18 other of Plaintiffs' employees have departed Futurewei or Huawei and gone to work for CNEX. At least one of these employees was caught downloading thousands of documents from Plaintiffs' information systems (including hundreds of confidential documents) before his departure from Plaintiffs and subsequently joining CNEX.

Plaintiffs filed this lawsuit against Huang and CNEX on December 28, 2017 for claims including but not limited to declaratory relief, breach of contract, violations of the Defend Trade Secrets Act of 2016, Conspiracy, violations of the Texas Uniform Trade Secrets Act, violation of the Computer Fraud and Abuse Act, violations of the Racketeer Influenced and Corrupt Organizations Act, and Lanham Act violations. (ECF No. 1.) Plaintiffs' Complaint seeks, in part, to establish ownership of the patents that were submitted by Huang, and to further determine what confidential, proprietary, and trade secret material belonging to Plaintiffs was used in those patent applications.

On the same day that Plaintiffs filed this lawsuit, and despite the Agreement's clear forum-selection and choice-of-law provisions specifying that any dispute related to Huang's Agreement must exclusively take place in the courts of Collin County, Texas using Texas law,

Defendants filed a competing claim against Futurewei in the Superior Court of California in Santa Clara County, seeking to invalidate Huang's Agreement under portions of the California Business Code. (A true and correct copy of the Complaint for Declaratory Relief, *Huang v. Futurewei Techs.*, 17CV321153, Cal. Super. Ct. ("California Action") is attached hereto as Exhibit B).

The day before Plaintiffs filed suit, Huang contacted in-house counsel for Huawei twice—first by email and then by telephone. In his correspondence, Huang indicated his belief that at least some of the patents at issue are essential to the NVMe standard, and that because both Futurewei and CNEX were members of the NVMe work group, that "it just does not make sense to file law suit on each other over NVMOE patents." (*See* R. Huang Corr. attached hereto as Exhibit C.) For purposes of clarity, NVMoE is a term meaning "NVM-over-Ethernet" which is directly related to work performed by Huang while at Futurewei.

The "NVMe work group" refers to NVM Express, Inc., a Delaware corporation whose members include more than 100 technology companies (including Huawei and CNEX) and that aims to promote the use and development of the NVM Express standards across the computing industry. NVM Express, Inc. publishes a collection of NVM Express standards, and its members grant reciprocal royalty-free licenses to one another to use technologies essential to the NVM Express standards. These standards include the NVM Express standard, NVMe Management Interface standard, and NVMe over Fabrics standard[1]. Companies involved in developing NVMe technologies and that are members of NME Express, Inc. allow one another to use the core, "essential" elements of the overall NVMe standard on a royalty-free basis. (*See* NVMe Express Inc. IPR Policy attached hereto as Exhibit D at ¶ 4.1.) Any non-essential technologies

---

[1] *See* https://nvmexpress.org/about/

developed by members—*e.g.*, a new technology that may use some part of the common NVMe standard but that is not a core, essential part of the standard—are not included in the reciprocal license. (*Id.*) If an NVM Express, Inc. member wishes to license any "essential" NVMe claims to a third party, that member must do so on a royalty-free basis. (*Id.* at ¶ 4.2.)

In his phone call, Huang further expressed his belief that the patents related to NVMe at issue are "essential" to the NVMe standard, and that because both companies were NVMe members, Huawei and CNEX cannot sue the other for using patents covering the realization of the NVMe standard. (*See* L. Shi Declaration attached hereto as Exhibit E.) This was the first time that Huang or CNEX to expressed their opinion that such patents related to NVMe were standard essential. Moreover, if Huang's statements about the patents being standard essential were accurate, such patents would then be potentially subject to a royalty-free licensing agreement.

Huang and CNEX have therefore indicated the belief that they are free to license, on a royalty-free basis, some of the patents at issue because Defendants believe those patents are essential to the NVMe standard. Plaintiffs have considerable reason to believe that those patents are **not** essential to the NVMe standard, and that Defendants intend to declare Plaintiffs' confidential, proprietary, and trade secret information embodied in those patents as essential to the NVMe standard. This declaration would result in the Defendants offering to third parties a royalty-free license. If Defendants were to do so, the harm to Plaintiffs would be irreparable—it would be nearly impossible for Plaintiffs to revoke such a license, and Platintiffs' confidential, proprietary, and trade secret information would be licensed not just to third parties, but to some of Plaintiffs' competitors.[2]

---

[2] According to its website, CNEX's investors include some of Plaintiff's direct competitors.

To avoid this irreparable harm and maintain the status quo, Plaintiffs seek injunctive relief that is nonetheless extremely limited: that Defendants be prohibited

- from directly or indirectly declaring any of the patents or patent applications listed in Plaintiffs' Complaint in this matter as essential to any of the NVM Express standards; and

- from entering into any licensing agreements or in any way conveying or disposing any rights to or in any of the patents or patent applications listed in Plaintiffs' Complaint in this matter.

The harm to Defendants if such an injunction were granted is minimal: Huang himself has indicated his belief that the patents are "essential" to the NVM Express standards, and would thus be licensed on a royalty-free basis anyway regardless of the ultimate determination of ownership by this Court. In contrast, if an injunction is not granted, Defendants' anticipated declaration of the patents at issue as essential to the NVM Express standards would irreparably harm the value of those patents. Plaintiffs are simply requesting that the Defendants be ordered not to irreparably destroy the value of Plaintiffs' confidential, proprietary, and trade secret information by giving that information away to third parties for free, pending this Court's determination of the merits of Plaintiffs' claims. The Motion for Preliminary Injunction should accordingly be granted.

## II. ARGUMENT

In exercising its discretion as to whether to grant preliminary or temporary injunctive relief, the Court must consider whether a party has demonstrated the following: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). In this case, Plaintiffs are able to demonstrate each factor.

A.      **Plaintiffs have a reasonable probability of success on the merits.**

To satisfy the first element of likelihood of success on the merits, the movant in a preliminary injunction proceeding "is not required to prove [its] entitlement to summary judgment." *Janvey*, 647 F.3d 585, 595–96 (5th Cir. 2011) *citing* Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a *prima facie* case but need not show that he is certain to win." (footnote omitted)). To assess the likelihood of success on the merits, courts look to "standards provided by the substantive law." *Id.* (*citing Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). In this case, Plaintiffs have a substantial likelihood of success on the merits of their claims. While Plaintiffs' Motion for a Preliminary Injunction does not implicate every claim included in Plaintiffs' Complaint in this matter, Plaintiffs are particularly likely to succeed on the merits of their claims for breach of contract regarding ownership of the patents at issue.

Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007). Plaintiffs can establish each element of their breach of contract claims in this case.

There is no dispute that Huang entered into the Agreement; indeed, Defendants affirmatively plead as much in their competing California lawsuit. *See* Cal. Action ¶ 11 ("On or about January 19, 2011, Mr. Huang and Futurewei entered into the Employment Agreement."); *id.* at Ex. A. There is similarly no dispute that Futurewei complied with all of the provisions of Huang's Agreement—Huang resigned from Huawei in 2013 and has never claimed that Futurewei breached his Agreement. With regard to Huang's breach, the Agreement unambiguously required him to assign to Plaintiffs all patents based on technologies that he

7

developed as part of his employment at Futurewei, regardless of whether Huang applied for those patents while still employed at Futurewei or after he left:

> **(a)** **Definition**. The term "Subject Ideas or Inventions" includes any and all ideas, processes, trademarks, service marks, inventions, designs, technologies, computer hardware or software, original works of authorship, formulas, discoveries, patents, copyrights, copyrightable works, products, marketing, and business ideas, and all improvements, know-how, date, rights, and claims related to the foregoing that, whether or not patentable, are conceived, developed or created which: (1) relate to the Company's current or contemplated business or activities; (2) relate to the Company's actual or demonstrably anticipated research or developments; (3) result from any work performed by me for the Company; (4) involve the use of the Company's equipment, supplies, facilities or trade secrets; (5) result from or are suggested by any work done by the Huawei Employment, Confidentiality, Proprietary Information and Inventions Agreement Company or at the Company's request, or any projects specifically assigned to me; or (6) result from my access to any of the Company's memoranda, notes, records, drawings. sketches, models, maps, customer lists, research results, data, formulae, specifications, inventions, processes, equipment or other materials (collectively, "Company Materials").
>
> **(b)** **Company Ownership**. All right, title, and interest in and to all Subject Ideas and Inventions, including but not limited to all registrable and patent rights which may subsist therein, shall be held and owned solely by the Company, and where applicable, all Subject Ideas and Inventions shall be considered works made for hire. I shall mark all Subject Ideas and Inventions with the Company's copyright or other proprietary notice as directed by the Company and shall take all actions deemed necessary by the Company to project the Company's rights therein. In the event that the Subject Ideas and Inventions shall be deemed no to constitute works made for hire, or in the event that I should otherwise, by operation of law, be deemed to retain any rights (whether moral rights or otherwise) to any Subject Ideas and Inventions, I agree to assign to the Company, without further consideration, my entire right, title and interest in and to each and every such Subject Idea and Invention.

Cal. Action at Ex. A at pp. 2-3.

To ensure the enforcement of those provisions, Huang was also required to notify Plaintiffs of any patent applications he submitted in the year after his employment ended if such applications in any way related to his work at the Company, even if he believed that those applications did not arise from Plaintiffs' intellectual property. (*Id.* at subsection (d).)

Huang ignored those contractual provisions, apparently to avoid assigning his patents to Plaintiffs as required by the Agreement. Again, and to be absolutely clear, the company that Huang founded *three days* after resigning from Futurewei specializes in the same NVMe-related technology that Huang worked on while employed by Futurewei. Although Huang's Agreement does not prevent him from working on NVMe technology for himself or a different company, it does restrict Huang from using proprietary technology and ideas he developed or learned while at Futurewei to do so. Within a month of resigning from Futurewei, Huang filed provisional patent applications now resulting in three granted patents and two pending patent applications directly related to the work he performed at Futurewei, and went on to file at least five more patent applications related to that work in the next few months. (ECF No. 1, ¶ ¶ 55-57.) Huang did not inform Plaintiffs that, less than a month after resigning from Futurewei, Huang was submitting patent applications based on the exact same NVMe technology that he was tasked with developing at Futurewei. Instead, Plaintiffs found out about those actions months later via publication of U.S. Patent and Trademark Office ("USPTO") filings.

Huang's Agreement is enforceable, and there is no reasonable dispute that he entered into it. *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 *amended sub nom. United States v. Dubilier Condenser Corp.*, 289 U.S. 706 (1933) ("One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment."); *Patent Harbor, LLC v. Twentieth Century Home Fox Home Entm't*, No. 6:10CV-607, 2012 WL 12842300, at *2 (E.D. Tex. Aug. 17, 2012) ("However, patent rights can be assigned, and a valid assignment that transfers "all substantial rights under the patent" vests independent standing in

the assignee to enforce the rights under the patent."). Indeed, in their competing California state court action, the only basis claimed by Defendants for invalidating Huang's Agreement was that it did not comport with California state law (despite the Agreement's clear choice-of-law provision dictating that Texas state law governs). *See* Ex. B at ¶¶32-48.

The damages to Plaintiffs as a result of Huang's breach of the Agreement are readily apparent. The patents at issue are not only worth considerable sums of money on their own, they are potentially related to other patentable technologies the value of which is impossible to quantify as this stage. The risk of Defendants licensing those patented technologies would jeopardize Plaintiffs' competitive advantages, and a royalty-free license would destroy the value of those patents. (*See* K. Wei Decl. ¶¶8-9 (attached hereto as Exhibit F)). Huang's communications with Huawei's counsel just before this lawsuit was filed included the implicit threat that "[b]oth companies interests can be hurt in such a legal battle." *See* Ex. C at p. 1. The damages to Plaintiffs if Defendants follow through on their threat and license the disputed patents to third parties on a royalty-free basis (especially to Plaintiffs' competitors) would irreparably harm Plaintiffs. They thus have a substantial likelihood of success on their breach of contract claims regarding ownership of the patents.

**B.      Without injunctive relief, Plaintiffs will suffer irreparable injury.**

A plaintiff must be threatened with irreparable injury for a court to issue a preliminary injunction. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 392 (1981). To show threat of irreparable injury, a plaintiff must demonstrate that "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Sirius Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 840-41 (W.D. Tex. 2015) *citing Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).

In this case, Defendants have already indicated their belief that they are free to license the patented technologies at issue—which Plaintiffs contend includes their confidential, proprietary, and trade secret information—to third parties on a royalty-free basis, and that they are free to do so at any time. If Defendants do so, Plaintiffs will lose their substantial investment in developing such confidential information in the first place. This is textbook irreparable harm. "In a situation where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable, and damages are impossible to calculate." *Am. Exp. Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996) (internal citations omitted) (rejecting defendant's arguments that plaintiff's damages could be measured and finding that plaintiff would suffer irreparable injury without injunctive relief). Particularly in the context of patent litigation, injunctive relief is appropriate to preserve the status quo until the Court can adjudicate any disputes regarding patent ownership or infringement. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (balance of hardships favored preliminary injunction preserving status quo during pendency of patent infringement litigation).

While it may represent a best practice of NVMe compliance system, the technologies that Defendants apparently intend to license to other parties are not essential to the NVMe standard. For example, in U.S. Patent No. 9,430,412, a "queue manager" is claimed. This queue manager, as discussed by Huang during prosecution of the patent application, is believed by Plaintiffs not to correspond to a feature expressly required by the NVMe standard. This patent claims a priority date that is less than thirty days from Huang's departure from Futurewei and is believed to disclose Plaintiffs' confidential, proprietary, and trade secret information.

Ultimately, if a patent that contains Huawei's proprietary trade secret information is wrongfully declared to be essential to the NVMe standard, a Huawei competitor could have a claim of a license for such patent, subject to royalty free and other terms under the NVMe IPR Policy. If Huawei's competitors would be allowed to use Huawei's proprietary technology, such as the Advanced Computing Network ("ACN") technology incorporated in some of the patents at issue, the harm to Huawei would be irreparable. For example, the ACN technology embodied in those patents allows Huawei to build revolutionary cloud computing infrastructure for its enterprise and carrier customers by disaggregating computing, storage, and/or networking functions. If a Huawei competitor is allowed to use such technology, Huawei would lose its competitive advance and further lose its market share to competitors. The ability to deliver high-performance and highly reliable cloud computing infrastructure is vital to Huawei's enterprise and carrier business. Losing such competitive advantage would lead to devastating consequences. (*See* Ex. F at ¶ 8.)

Moreover, Huawei would be irreparably harmed by such a wrongful declaration because Huawei would lose its competitiveness in Network Function Virtualization ("NFV") network projects if its competitors are allowed to use Huawei's proprietary ACN technology on a royalty-free basis to build cloud computing infrastructure and compete with Huawei. NFV is a concept that transforms telecom carriers' network function nodes from dedicated hardware to software-based services running in cloud computing systems, or in other words, high-end distributed computing and storage systems. NFV is a revolutionary concept that could transform the carrier network market, which is one of Huawei's key markets. If Huawei cannot maintain its competitiveness in emerging NFV projects, Huawei would lose its market share to its competitors during the NFV transformation of carrier networks. (*See* Ex. F at ¶ 9.)

**C.     The requested limited injunctive relief will not result in even greater harm to Defendants and is in the public interest.**

In considering the appropriateness of injunctive relief, a court should balance the possible harm to plaintiff from denying the injunction against the possible harm to the defendant from granting it. *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531 (1987). The harm, if any, Defendants might suffer if the Court orders the requested limited preliminary injunction is far less than the harm Plaintiffs will suffer if it is not. Simply put, the only potential harm to Defendants caused by the injunction will be that they cannot license the patents at issue on a *royalty-free* basis to third parties pending the outcome of this case. Defendants could not possibly suffer any monetary harm as a result of the requested injunction, because Huang himself has indicated his belief that the technologies are essential to the NVM Express standards, i.e. they would be licensed without any royalties.

On the other hand, Plaintiffs will suffer irreparable harm if a preliminary injunction is not entered because Defendants intend to declare the disputed patents as NVMe standard-essential, and thus offer a royalty-free license to Plaintiff's proprietary technologies. (*See* Ex. F.) If Defendants do so, it would be nearly impossible for Plaintiffs to revoke those licenses or claw back the technologies before they become disseminated throughout the industry. (*Id.*) Plaintiffs' substantial investment in those technologies would be irretrievably lost.

Nor would the entry of the requested injunctive relief result in any harm to the public interest. The protection of trade secrets and the enforcement of reasonable contracts both serve the public interest. *Am. Derringer Corp. v. Bond*, 924 S.W.2d 773, 778 (Tex. App. 1996) ("[T]he protection of a trade secret is a well-recognized objective of equity."); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 571 (S.D. Tex. 2014) ("…it is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law."). Whereas Defendants

have no legitimate right or interest to disclose Plaintiffs' trade secrets to third parties in competition with Plaintiffs, and where Defendants are not the owners of the patents that they apparently seek to license on a royalty-free basis to Plaintiffs' competitors, the public interest is in favor of an injunction preventing them from doing so.

Finally, the requested injunctive relief affirmatively serves the public interest because it protects innocent third parties from becoming unwittingly embroiled in an ongoing dispute over the ownership of the confidential, proprietary, and trade secret information. Specifically, an injunction that prevents Defendants from declaring the patents or patent applications standard essential to any of the NVM Express standards, and that further prevents Defendants from entering licensing agreements for the disputed technology, avoids the risk of third parties relying to their detriment on Defendants' false claims of ownership and entering into agreements that this Court may later be required to void.

In conclusion, for the reasons set forth above, Plaintiffs are in urgent need of an injunction prohibiting any declaration by Defendants that the disputed patents are standard-essential and prohibiting Defendants from licensing the patented technologies, which rightfully belong to Plaintiffs. Court intervention is necessary to protect Plaintiffs' confidential, proprietary, and trade secret information until a determination can be made on the merits of Plaintiffs' claims. Accordingly, the Court should grant Plaintiffs' Motion.

### III. CONCLUSION

Plaintiffs Huawei Technologies Co., Ltd. and Futurewei Technologies, Inc. respectfully request that this Court grant Plaintiffs' Motion for Entry of a Preliminary Injunction and enter an Order in the form attached that specifically enjoins Defendants Yiren Ronnie Huang and/or CNEX Labs, Inc.:

- from directly or indirectly declaring any of the patents or patent applications listed in Plaintiffs' Complaint in this matter as essential to any of the NVM Express standards; and

- from entering into any licensing agreements or in any way conveying or disposing any rights to or in any of the patents or patent applications listed in Plaintiffs' Complaint in this matter.

Plaintiffs further request that this injunction remain in place until a determination can be made by this Court as to the ownership of those patents and patent applications.

Plaintiffs further request a hearing at the Court's earliest availability to present further evidence in support of this Motion.

Plaintiffs request all further relief to which they may be legally and/or equitably entitled.

Dated: January 19, 2018          Respectfully Submitted,

By:    */s/ Clyde M. Siebman*

Respectfully submitted,

**SIEBMAN, BURG, PHILLIPS & SMITH, LLP**

**Clyde M. Siebman**
Texas Bar No. 18341600
**Elizabeth S. Forrest**
Texas Bar No. 24086207
Federal Courthouse Square
300 N. Travis Street
Sherman, Texas 75090
(903) 870-0070 (office)
(903) 819-3076 (cell)
clydesiebman@siebman.com

**SEYFARTH SHAW LLP**

**Michael D. Wexler** (*Admitted Pro Hac Vice*)
Illinois State Bar No. 6207847
**Andrew S. Boutros** (*Admitted Pro Hac Vice*)
Illinois Bar Number: 6322276
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606

**Jesse M. Coleman**
E.D. Tex. Bar. No. 24072044
Texas Bar No. 240702044
700 Milam Street, Suite 1400
Houston, Texas 77002-2812
Telephone: (713) 225-2300
Telecopier: (713) 225-2340
jmcoleman@seyfarth.com

*Attorneys for Huawei Technologies Co., Ltd. and Futurewei Technologies, Inc*.

## **CERTIFICATE OF CONFERENCE**

The undersigned counsel certifies that 1) that counsel has complied with the meet and confer requirement in LOCAL RULE CV-7(h); and (2) Plaintiffs' Motion appearing above is opposed. A telephone conference with counsel for Defendants was held on January 10, 2018, followed by extensive email exchanges addressing the topic of this motion. The participants in that conference and exchanges were Michael Sacksteder and Guinevere Jobson for CNEX Labs, Inc.; Matt Rawlinson for Yiren Ronnie Huang; Mike Wexler, Andrew Boutros, Clyde Siebman, and Jesse Coleman for Plaintiffs. No agreement could be reached because Defendants are opposed to the entering of the requested injunction. The discussions have conclusively ended in an impasse, leaving an open issue for the court to resolve.

*/s/ Clyde M. Siebman*
Clyde M. Siebman

## **CERTIFICATE OF SERVICE**

      I hereby certified that on **January 19, 2018**, copies of this submission were served by electronic mail and certified mail on counsel for Defendants as they have appeared in the California Action.

FENWICK & WEST LLP
Michael J. Sacksteder
555 California Street, 12th Floor
San Francisco, CA 94104
msacksteder@fenwick.com
*Attorneys for CNEX Labs, Inc.*


LATHAM & WATKINS LLP
Gabriel S. Gross
140 Scott Drive
Menlo Park, CA 94025
Gabe.gross@lw.com
*Attorneys for Yiren Huang*


                                                          By:   */s/ Clyde M. Siebman*
                                                                      Clyde M. Siebman

                                                                       *Counsel for Huawei Technologies Co., Ltd.*
                                                                       *and Futurewei Technologies, Inc*.