# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| HUAWEI TECHNOLOGIES CO., LTD., and FUTUREWEI TECHNOLOGIES, INC., <br><br> v. <br><br> YIREN RONNIE HUANG, and CNEX LABS, INC. | § § § § § § § § § § Civil Action No. 4:17-CV-00893 <br> Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion to Strike the Expert Reports and Testimony of Keith R. Ugone, PH.D. Regarding Damages (Dkt. #260). The Court, having considered the pleadings, reports, and relevant briefings, finds that the motion should be denied.

### BACKGROUND

Plaintiff Huawei Technologies Co., Ltd. ("Huawei") is a multinational networking and telecommunications equipment and services company headquartered in China. Plaintiff Futurewei Technologies, Inc. ("Futurewei") is a subsidiary of Huawei with several offices throughout the United States, including Plano, Texas. In December 2010, Futurewei offered Defendant Yiren "Ronnie" Huang ("Huang") employment as a Principal Engineer for its solid-state drive ("SSD") storage group, to assist in development and implementation of Advance Computing Network ("ACN"), non-volatile memory express ("NVMe"), and SSD technology. Huang accepted the offer in January 2011. The Employment Agreement contained provisions relating to non-disclosure, assignment, and non-solicitation.

Based on Huang's job responsibilities, Plaintiffs contend that Huang had access to confidential, proprietary, and trade secret information. On May 31, 2013, Huang ended his employment with Futurewei. On June 3, 2013, Huang, along with others, incorporated CNEX

Labs, Inc. ("CNEX"), a Delaware Corporation with its principal place of business in California. Plaintiffs allege, among other things, that Huang incorporated CNEX to compete directly with Plaintiffs; Huang is using Plaintiffs' confidential, proprietary, and trade secret information to develop and improve SSD technology and NVMe related technology for CNEX; and further that Huang and CNEX are improperly soliciting employees away from Plaintiffs. Additionally, Plaintiffs allege that Huang started to engage in this behavior informally prior to leaving Futurewei. Plaintiffs further contend that Huang and CNEX began filing patent applications in June 2013, using the information that Huang obtained through his employment with Futurewei.

On March 11, 2019, Plaintiffs filed a Motion to Strike the Expert Reports and Testimony of Keith R. Ugone, PH.D. Regarding Damages (Dkt. #260). On March 26, 2019, Defendant CNEX filed a response (Dkt. #276). On April 4, 2019, Plaintiffs filed a reply (Dkt. #288). On April 9, 2019, Defendant CNEX filed a sur-reply (Dkt. #304).

**LEGAL STANDARD**

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590–93 (1993). Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable.

*Daubert*, 509 U.S. at 590–91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

# ANALYSIS

Defendants designated Keith R. Ugone, PH.D. as an expert on damages. Plaintiffs request that the court exclude Dr. Ugone's affirmative report (the "Ugone CC Report") and his rebuttal report (the "Ugone's RB Report") in their entirety and prohibit Dr. Ugone from testifying in connection with Defendants' counterclaims against Plaintiffs or in rebuttal to the testimony of Plaintiffs' damages expert.

## I. The Ugone CC Report

Plaintiffs' attack on the Ugone CC Report is two-fold. First, Plaintiffs contend that the Ugone CC Report should be stricken, in its entirety, as unreliable because it is premised on unsupported facts, unreliable data, and invalid assumptions. Specifically, Plaintiffs aver that the Ugone CC Report is untethered to the specific trade secrets that Defendants allege were misappropriated by Plaintiffs. Instead, Plaintiffs argue, the Ugone CC Report includes calculations concerning and references to trade secrets that have not been asserted in the present litigation. Further, Plaintiffs argue Dr. Ugone fails to independently verify the information underlying the basis of his reports.

Second, Plaintiffs argue more specifically that the Ugone CC Report's damages theories should be stricken, including the report's (1) unjust enrichment analysis; (2) lost profits analysis; (3) profit margin analysis; and (4) reasonable royalty analysis. The Court discusses each, in turn.

### A. Plaintiffs' Challenge to the Ugone CC Report's General Reliability

Plaintiffs contend that, although Defendants allege the misappropriation of only ten trade secrets, the Ugone CC Report's analysis includes research and development expenses related to at least sixteen, and up to thirty-four, additional trade secrets. Plaintiffs argue that the report's calculations should be limited to the research and development expenses attributable solely to the

ten trade secrets that Defendants allege to have been misappropriated by Plaintiffs. CNEX responds that Ugone CC Report's calculation method is appropriate—and even necessary—given the nature of CNEX's business model. CNEX explains that it is a small start-up company that focuses solely on technology concerning SSD controllers, of which its asserted trade secrets are a byproduct. That is, the asserted trade secrets are an integral part of the all research and development and it is not possible to identify and apportion research and development expenses that are tied solely to the ten trade secrets. Thus, CNEX contends, it is necessary for Dr. Ugone to base his analysis on the entirety of CNEX research and development expenses.

The Court finds this explanation reasonable as to the Ugone's CC Report method of factoring in its calculations the entirety of CNEX's research and development expenses. Further, even in the event that such an apportionment is possible, the degree of which CNEX's research and development expenses are related to CNEX's asserted trade secrets will depend on the jury's determination of what, if any, are Defendants' trade secrets. Plaintiffs do not take issue with the method of the Ugone CC Report; rather, they find issue with the figures used and the Dr. Ugone's explanation. These disputes are better explored on cross-examination. *See Daubert*, 509 U.S. at 596.

Plaintiffs argue next that the Ugone CC Report turns on unreliable and unrelated facts, and that Dr. Ugone fails to verify critical information. "'As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned [to] that opinion rather than its admissibility and should be left to the jury's consideration.'" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (emphasis in original) (citation omitted). "It is the role of the adversarial system, not the court, to highlight weak evidence." *Id*. Further, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction

5

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Plaintiffs' challenges are best addressed on cross-examination. *Id*.

### B. Plaintiffs' Challenges of the Ugone CC Report's Damages Theories

"Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret; the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a reasonable royalty." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013) (quoting *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012)). Plaintiffs take issue with the Ugone CC Report's (1) unjust enrichment analysis; (2) lost profits analysis; (3) "hoped for" profit margin; and (4) reasonable royalty analysis.

#### i. Unjust Enrichment

Plaintiffs' challenge herein is binal. First, Plaintiffs argue that the report's unjust enrichment analysis is not helpful to the trier of fact because it is a product of simple calculations. That is, the unjust enrichment analysis does not require complex computation, therefore Dr. Ugone's opinion, in this respect, is not helpful to the jury and should be stricken. The Court finds this argument unpersuasive. As the Eighth Circuit explained in rejecting this argument, "[t]here is not, as [Plaintiffs] suggest, an implicit requirement in FED. R. EVID. 702 for the proffered expert to make *complicated* mathematical calculations." *See WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) (emphasis in original). Courts in this circuit, in fact, regularly allow expert witnesses, in a myriad of circumstances, to engage in simple calculations to develop their expert opinions. *See, e.g.,*

6

*Richards v. Lufkin*, No. 9:14-CV-00136, 2017 WL 4320700, at *7 (E.D. Tex. Sept. 28, 2017); *Fontenot v. Safety Council of Southwest Louisiana*, No. 2:16-CV-84, 2017 WL 3588200, at *4 (W.D. La. Aug. 16, 2017); *Little v. Tech. Specialty Prod., LLC*, 940 F. Supp. 2d 460, 469 (E.D. Tex. 2013). This is presumably because, even if an expert is not performing advanced calculus, the expert is still analyzing financial data, considering several variables that a lay person may not immediately appreciate. *See WWP, Inc.*, 628 F.3d at 1040 (affirming a district court that found an expert's testimony on simple math admissible since it, nevertheless, involved substantial financial analysis). The Court finds that the Ugone CC Report's calculations are a proper subject of expert testimony.

Second, Plaintiffs again argue that the Ugone CC Report's unjust enrichment calculations are fundamentally flawed because they include CNEX's total research and development expenditures instead of, what Plaintiffs find more proper, allocating research and development expenses attributable solely to Defendants' ten assert trade secrets at issue in the present action. As the Court has explained above, the Ugone CC Report's all-inclusive treatment of research and development expenses is based CNEX's unique business model. Further, if a Plaintiffs are found to have "enjoyed actual profits" in misappropriating trade secrets, "a type of restitutionary remedy can be afforded [to] the [defendants]—either recovering the full total of [plaintiffs'] profits or some apportioned amount designed to correspond to the actual contribution the [defendants'] trade secret made to the [plaintiffs'] commercial success." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). Whether the full amount of profits is attributable to the alleged misappropriation of trade secrets is for the jury to decide when awarding damages. *See Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 855–56 (E.D. Tex. 2012). The Court finds that Dr. Ugone's failure to apportion is not fatal to his

opinion since such a determination is for the jury. *See id*. Thus, any challenges to that model and allocation scheduled set forth in the Ugone CC Report is best handled on cross-examination. *See Daubert*, 509 U.S. at 596.

### ii. Lost Profits

Plaintiffs argue that Ugone's lost profit analysis should be stricken as unreliable because: (1) it is based on the lost fees from hypothetical joint collaboration agreement that suffers from a fatal analytical gap and (2) misapplies the *Panduit* factors. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc*., 575 F.2d 1152 (6th Cir. 1978).

Plaintiffs argue that the Ugone CC Report reliance on a hypothetical collaboration agreement is fundamentally flawed because the report fails to claim that CNEX had chip suitable for use in Huawei's products, fails to explain why Huawei, at the time, would have been interested in the allegedly misappropriated trade secrets, and relies on later joint collaboration agreements between CNEX and other companies in separate industries with separate needs. Plaintiffs contend that these failures, collectively, establish an analytical gap that the Ugone CC Report cannot overcome.

The Court disagrees. The nature of Defendants counterclaims is that Plaintiffs misappropriated their trade secrets. Therefore, the Ugone CC Report presumption that Plaintiffs would have entered into a joint collaboration agreement is premised on the idea that Plaintiffs' demand for Defendants' trade secrets is evidenced by Plaintiffs' efforts to misappropriate them. Whether or not this proves true is a factual dispute left to the jury. It is not, however, improper for the Ugone CC Report to presume Huawei's interest given the allegations and the nature of a hypothetical agreement. Further, as CNEX explain, the nature of CNEX's business does not require them to have chips in stock and ready to sell. CNEX explain that its business model is to

enter development agreements with companies needing SSD controllers and jointly develop the SSD controllers using CNEX's trade secrets. Thus, it is immaterial whether, at the time, CNEX would have chips suitable for Huawei's product, if the nature of CNEX's business model is enter into an agreement to collectively develop the SSD controllers using, in part, CNEX's trade secrets. Finally, the fact that the Ugone's CC Report references later-executed collaboration agreements between CNEX and other companies does not strike a fatal blow to the analysis. To the contrary, the Federal Circuit has opined that "factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation . . . ." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1031, 1333 (Fed. Cir. 2009).

The Court further disagrees with Plaintiffs' contention that Defendants deviated from the *Panduit* factors in such a manner that renders the Ugone CC Report's reliance thereon fatally unreliable. The *Panduit* test provides that a "patentee is entitled to lost profit damages if it can establish four things: (1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978)). Plaintiffs take issue with the Ugone CC Report's modification of the second and third factors. Regarding the second factor, Plaintiffs argue that CNEX fails to establish the absence of acceptable non-infringing alternative and, thus, fails to properly consider the causal connection between the misappropriation and the Defendants' lost profits. As for the third factor, Plaintiffs argue that the Ugone CC Report improperly substitutes a showing of "manufacturing and marketing capability to exploit demand" with a showing of "an ability to have claimed a loss." While the Court recognizes the importance of maintaining the integrity of

9

the *Panduit* factors, it is equally important that the Court be mindful that every misappropriation of trade secrets case "requires a flexible and imaginative approach" to calculating damages and that "each case is controlled by its own peculiar facts and circumstances." *Lykes-Youngstown Corp.*, 504 F.2d at 538. Having reviewed the Ugone CC Report, the Court does not find that fatal to its reliability the report's alteration of the second and third factors.

### iii. Profit Margin

Plaintiffs contend that the Ugone CC Report makes inconsistent and unreliable references to CNEX's profit margin. In this respect, Plaintiffs challenges with the underlying figures used and referenced in the report is best attacked on cross-examination. *See Daubert*, 509 U.S. at 596.

### iv. Reasonable Royalty

Plaintiffs argue that the Ugone's CC Report's reasonable royalty analysis should be stricken because it is premised on two agreements—CNEX's collaboration agreements with Dell and Microsoft, respectively—without explaining and accounting for the differences between the agreements.[1] To apply "a reasonable royalty as to the measure of damages is to adopt . . . the fiction that a license was to be granted at the time of beginning the [misappropriation], and then to determine what the license price should have been." *Lykes-Youngstown Corp.*, 504 F.2d at 537. The proper standard in such a case is "the willing buyer-willing seller test: the primary inquiry is what the parties would have agreed upon, if both were reasonably trying to reach an agreement." *Id.* (internal citations omitted). Plaintiffs contend that the Ugone CC Report fails to

---

[1] On May 3, 2019, the Court held a pretrial conference to discuss pertinent matters. During the conference, counsel for Plaintiffs indicated that United States District Judge William H. Alsup of the Northern District of California recently struck a report by Dr. Ugone because it failed to account for the differences between a hypothetical agreement and prior agreements that Dr. Ugone proposed were comparable. The Court granted Plaintiffs leave to file the supplemental authority and reserved ruling on the admissibility of Dr. Ugone's affirmative and rebuttal reports. Plaintiffs later expressed an inability to retrieve a copy of the Order because it was under seal. The Court subsequently obtained the Order, which has not been disclosed to any party. After reviewing Judge Alsup's Order, the Court finds that the facts of the present action are distinguishable and does not elicit the concerns that Judge Alsup found.

explain and account for the technological and economic differences between the two agreements and its hypothetical agreement with Huawei. While the Court agrees with Plaintiffs' assessment of the precedent that requires a proponent of the use of outside agreements to explain the difference between those agreements and the proposed hypothetical one, in this limited circumstance, CNEX's business model mitigates the need for a meticulous and comprehensive explanation of the differences. As CNEX explain, its business model is such that if a party wanted to use any of CNEX's trade secrets, they are required to enter into a development agreement. CNEX argues that the development agreement is not calculated pursuant to the mere number or type of trade secrets a party wants access to. Instead, a party that enters into a development agreement with CNEX gets access to any and all of CNEX's trade secrets, so there is no apportionment. Therefore, the Court finds that the Ugone CC Report's method of comparing the Mircosoft and Dell agreements with a hypothetical agreement between Huawei and CNEX is not flawed to such an extent that it renders the opinion unreliable.

## II.     The Ugone RB Report

Similar to its challenge of the Ugone CC Report, Plaintiffs request that the Court strike the Ugone RB Report because it "suffers from the same rank speculation . . . ." (Dkt. #260 at p. 24). Again, Plaintiffs' dispute goes to the weight of the Dr. Ugone's rebuttal report and not its admissibility. Such challenges are better addressed on cross-examination. *See Daubert*, 509 U.S. at 596.

## CONCLUSION

Therefore, for the above-mentioned reasons, the Court finds that Plaintiffs' Motion to Strike the Expert Reports and Testimony of Keith R. Ugone, PH.D. Regarding Damages (Dkt. #260) is **DENIED.**

**SIGNED this 6th day of June, 2019.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE